ST. PAUL ABSTRACT CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3006.   Promulgated May 4, 1927.

A corporation in which the use of capital is a material income-producing factor *held* not to be a personal service corporation.

*Samuel Lipschultz, Esq.,* for the petitioner.
*D. D. Shepard, Esq.,* for the respondent.

This is a proceeding for the redetermination of deficiencies in income and profits taxes for $1,838.56, $890.88, and $746.36, for the years 1919, 1920, and 1921, respectively.   The deficiencies result in part from the respondent having refused to classify the petitioner as a personal service corporation.

### FINDINGS OF FACT.

J. A. Soucheray, prior to his coming to the United States and while in France, was for many years employed in a mortgage registry office.   After he came to the United States he was engaged in the business of abstracting titles.   From 1887 to 1889 he was employed in the office of the Abstract Clerk for Ramsey County, Minnesota. Subsequently and until 1891 he was an officer and employee of an abstract company located in that county.   During 1891 he and his son H. C. Soucheray were occupied in compiling data and information relating to titles to real estate in Ramsey County for the purpose of forming a new company.   In 1892 his collection of data was sufficiently complete for him to prepare abstracts of title from his own records.

In September, 1892, J. A. Soucheray organized under the laws of Minnesota the petitioner corporation, with a capital stock of $50,000 divided into 1,000 shares of a par value of $50 each, for the purpose of furnishing abstracting service to the public.   The incorporators were J. A. Soucheray, Michael P. Ryan, and Charles L. Haas.   Immediately following the incorporation of the petitioner, stock was issued as follows:

| | Shares. |
|---|---|
| J. A. Soucheray | 1 |
| M. L. Soucheray | 332 |
| Charles L. Haas | 600 |
| M. P. Ryan | 20 |
| George Seisander | 27 |
| Annie E. Haas | 20 |
| Total | 1,000 |

No money nor anything of value was paid to the corporation for the stock that was issued to these original stockholders. The issuance of stock to Ryan, Seisander, and the Haases was to get the name of Charles L. Haas, Register of Deeds, associated with the petitioner corporation.

In 1895 as a result of some dishonest practices of a former manager, whose connection as an officer and stockholder had been terminated previously, it became necessary for the company to execute promissory notes totaling $4,310 to make good certain overdrafts and for attorney's fees in connection therewith.

In 1902 Ryan had acquired the Haas holdings in the company and in that year he transferred the stock formerly held by him together with that acquired from the Haases to J. A. Soucheray, in exchange for Soucheray's interest in certain real property to which they both held an interest.

In 1902 the other two abstract companies then operating at St. Paul were merged with the petitioner. In the merger J. A. Soucheray parted with $15,000 par value of his stock to W. W. Price, as an individual and as trustee for A. Cathcart and A. C. Maxfield. As a part of the consideration of the merger the petitioner issued bonds amounting to $13,000, which were subsequently paid from its earnings. Price, who negotiated the merger, turned over to the petitioner the physical assets of the other two corporations which consisted of index books, slips, and some maps and tracings. These were for the most part duplicates of the records and data which the petitioner already had and with the exception of a few maps and tracings, most of them were destroyed. As a result of the merger, petitioner's two competitors had been eliminated, and there became identified with it W. W. Price, a prominent realtor in St. Paul who at that time had associated with him many people prominent and influential in a financial way who were dealing in real estate and making loans.

In 1892 H. C. and A. T. Soucheray, sons of J. A. Soucheray, were employed by the petitioner and have continued in its employment.

The service rendered by the petitioner consists in furnishing complete abstracts, extending abstracts or bringing them down to date, and making special reports as to who are the owners of certain real estate and as to what real estate is owned by certain individuals. All complete and extended abstracts of title furnished by the petitioner contain the following:

We guarantee our abstracts for all time as legal tender under contract, and in case of same being refused, we will be willing to step in the shoes of the holder and enforce the tender or pay the amount necessary to make said abstract a legal tender if it is found not so to be.

This guarantee was a material factor in securing business—without it the business would not have been so great. The petitioner guaranteed its abstracts and protected against loss resulting from errors or omissions therein any one into whose hands the abstract came.

During the years 1919, 1920, and 1921 its income was derived from such services. Petitioner conducts its business on a cash basis, most of its customers paying their bills within from 5 to 10 days. In some instances credit is extended beyond a 30-day period. However, the largest account receivable during 1919, 1920, and 1921 was not in excess of $175.

With the exception of bonds issued in connection with the merger the company has never borrowed any money for the operation of its business, since its earnings have always been sufficient to meet its operating expenses.

Petitioner's assets consisted of the usual office appliances, such as desks, chairs, typewriters, fireproof safe, and its abstract records. The abstract records are composed of eighteen large books which are known as the "basic index." In these books are contained a series of accounts of platted property by additions, the lot and block descriptions, the definements, and subdivisions. In some instances there are arbitrary divisions made so as to facilitate the finding of instruments referring to certain individual property. In addition to the foregoing, there is another book containing what is called "subdivided land of government subdivisions." The petitioner also maintains a satisfaction record, judgment record, and a record of miscellaneous instruments such as wills, powers, affidavits and other instruments of a general character, making a total of approximately twenty-five books. The petitioner maintains an index used for free service which reflects in a very concise way all encumbrances against every piece of property covered in the index. This index is maintained for the purpose of furnishing to the public without cost certain information. The petitioner also has maps and plats. Petitioner's data and notes relating to real estate go back to 1847. These records and data have been built up on the information compiled by J. A. and H. C. Soucheray and have been kept up to date. In the event of the destruction of the petitioner's records, it would still be able to continue its business by using the public records, but could not have rendered the same service, and would not have made as much money. The petitioner by using its own records saves about one-fourth of the time that would be required if it used the public records.

The following is a statement showing the name of the stockholders, the offices held, and stockholdings and the percentages of the total stock held by each during the years involved in this proceeding:

| Name. | Office. | Stockholdings. | | Percentage of total. |
| --- | --- | --- | --- | --- |
| | | Amount. | Shares. | |
| **Jan. 1, 1919, to Mar. 19, 1920:** | | | | |
| W. W. Price | President | $6,000 | 120 | 12 |
| J. A. Soucheray | Vice president | 25,000 | 500 | 50 |
| A. F. Soucheray | Secretary | 5,000 | 100 | 10 |
| H. C. Soucheray | Treasurer | 5,000 | 100 | 10 |
| W. W. Price, trustee for A. Cathcart and A. C. Maxfield. | | 9,000 | 180 | 18 |
| | | 50,000 | 1,000 | 100 |
| **Mar. 19, 1920, to July 23, 1921:** | | | | |
| W. W. Price | President | 6,000 | 120 | 12 |
| J. A. Soucheray | Vice president | 25,000 | 500 | 50 |
| A. F. Soucheray | Secretary | 5,000 | 100 | 10 |
| H. C. Soucheray | Treasurer | 5,000 | 100 | 10 |
| A. Cathcart | | 6,000 | 120 | 12 |
| A. C. Maxfield | | 3,000 | 60 | 6 |
| | | 50,000 | 1,000 | 100 |
| **July 23, 1921, to Dec. 31, 1921:** | | | | |
| W. W. Price | President | 6,000 | 120 | 12 |
| A. F. Soucheray | Vice president and secretary | 13,500 | 270 | 27 |
| H. C. Soucheray | Treasurer | 13,500 | 270 | 27 |
| A. Cathcart | | 6,000 | 120 | 12 |
| A. C. Maxfield | | 3,000 | 60 | ·6 |
| Marie E. Liedel | | 8,000 | 160 | 16 |
| | | 50,000 | 1,000 | 100 |

J. A. Soucheray died on July 23, 1921, and his holdings passed to his sons, A. F. and H. C. Soucheray, and to his daughter, Marie E. Liedel. The sons' holdings were thereby increased from 100 shares each to 270 shares each, while the daughter acquired 160 shares. Salaries paid the officers were as follows:

| | 1919. | 1920. | 1921. |
| --- | --- | --- | --- |
| W. W. Price, president | $100 | $100 | $100 |
| J. A. Soucheray, vice president | 2,250 | 3,000 | 1,750 |
| A. F. Soucheray, secretary | 2,250 | 3,000 | 3,125 |
| H. C. Soucheray, treasurer | 2,250 | 3,000 | 3,125 |
| Total | 6,850 | 9,100 | 8,100 |

During 1919, 1920, and 1921, Price, who was president of the petitioner corporation, was engaged in the real estate business, operating individually, and maintaining an office separate from the petitioner. He was secretary and real estate agent of two corporations formed for holding real estate. His duties with these companies consisted of caring for the property held by them, collecting rents, and selling property when any was sold. He was local agent for a number of eastern and foreign estates, and his duties in connection therewith were similar to those with the corporations. He received no salary from the corporations or the estates, but payment for his services was made in the form of commissions. He was also executive secretary of the St. Paul Real Estate Board, the duties of which required not more than one-half of an hour of his time each day. He was treas-

urer of St. Luke's Hospital, which did not require much of his time, and as such he rendered his services gratuitously. His fixed duties with the petitioner corporation consisted of signing checks. He made frequent but not daily visits to petitioner's office. During these visits, which averaged about ten minutes each, he consulted with the other officers in regard to the policies of the company and the increased progress of its business. He used his influence in obtaining the enactment by the Minnesota Legislature of a law which permitted an abstract company in Ramsey County to increase its fees to an equality with the charges being allowed in all other counties in the State. He was also instrumental in securing the adoption by the St. Paul Real Estate Board of an earnest-money contract which provided that all abstracts of title should be fully and completely certified to and required the services of the petitioner corporation. Price turned to the petitioner all of his own abstracting business, and that of the interests which he represented.

J. A. Soucheray, who was vice president of the petitioner corporation during 1919, 1920, and until his death in 1921, devoted his entire time to the business, being engaged upon the most important or foundation work of petitioner's business. His duties consisted of taking off information from the instruments and records in the office of the Register of Deeds and posting such information to the proper place in the records of petitioner. This required him to examine deeds, mortgages, assignments, satisfactions, foreclosures, wills, powers, and leases, making notes of the necessary and salient features contained in such instruments and pose in petitioner's records to the lot or block, or government subdivision the instruments as he judged they affected the title of various properties. This work was done entirely by J. A. Soucheray, except during his absence on account of illness, or otherwise, when it was performed by his sons. In addition to the foregoing, he prepared abstracts of difficult or complicated titles.

A. F. Soucheray, who was secretary, devoted his entire time to the business, and his duties were to make extensions of abstracts of title. This required that he check against petitioner's records the abstract to be extended and from those records prepare such additional data as was necessary to extend or bring the abstract down to date.

The duties of H. C. Soucheray, who was treasurer, and who devoted his entire time to the business, consisted of preparing complete abstracts. This required him to locate on the government subdivisions the property the title to which was to be abstracted, together with the facts relating to the various titles involved, get together the instruments affecting the title to the particular piece of property and arrange them in what is known as an abstract of title. He also

compiled the additional data necessary to completion of an abstract of title in connection with Torrens title reports. He often drew realty conveyances, deeds, mortgages, notes, and other instruments of a similar character.

All abstracting work of the petitioner was done by the three Soucherays.

Cathcart, Maxfield and Mrs. Liedel were not in the employ of the company and had no connection with it except through their stock ownership. During 1919, 1920, and 1921 the company employed five or six stenographers or typists. In addition to the above employees Joseph L. Liedel, the husband of Marie Liedel, received in 1919 a salary of $1,550. During that year his duties were to get acquainted with the business and to assist J. A. Soucheray. He performed similar duties in subsequent years. The petitioner had three other men in its employ, one of whom received $1,555 per year and whose duties consisted of making collections, soliciting new business and running a photostat machine. Another man assembled and delivered abstracts, obtained information relative to outstanding and unpaid taxes against the various tracts of land and performed other "simple" work. Another man employed in 1919 worked on the judgment book, made property searches and judgment reports. Occasionally an attorney was employed in connection with some point of law that arose in the abstract work when H. C. Soucheray did not have time to look it up. The total salaries paid employees other than officers were as follows:

1919 _____ $6, 986. 10
1920 _____ 9, 522. 25
1921 _____ 10, 781. 75

The petitioner reported gross income and net income as follows:

| Year. | Gross income. | Net income. |
| --- | --- | --- |
| 1919 | $32, 793. 78 | $4, 620. 41 |
| 1920 | 36, 901. 00 | 9, 717. 64 |
| 1921 | 35, 178. 34 | 7, 495. 80 |

In arriving at net income, officers' and employees' salaries were considered.

During 1919, 1920, and 1921, the petitioner was not a personal service corporation.

OPINION.

TRAMMELL: The issue involved in this proceeding is whether during 1919, 1920, and 1921 the petitioner was a personal service corporation within the meaning of section 200 of the Revenue Acts of

1918 and 1921. The pertinent provisions of that section are as follows:

The term "personal service corporation" means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor * * *.

It is clear that the abstract records constituting its plant were capital. While we do not know the amount invested in such assets, we do know that they were used by the petitioner in producing its income. They had been built up over a long period of years. It was necessary to keep them posted from day to day from the public records. *Appeal of Record Abstract Co.*, 2 B. T. A. 628.

The *amount* of capital used in the business is not important if what was used was a material factor in producing the income. We think that the records and books of the petitioner which it used in making its abstracts of title were a material factor in the production of the income. It was testified that the same service could not have been rendered without them; that petitioner could not have made as much money and that without these records it would have taken at least 25 per cent longer time to prepare the abstracts. Even if it be conceded that it was not necessary to use these records in carrying on the business, the fact is they were actually used with great advantage. The saving of 25 per cent of time by their use is itself a material element of advantage and was a material income-producing factor. The fact also appears that the same service could not have been rendered without them.

In addition to the value to the business of the records, the petitioner guaranteed its abstracts and held itself responsible for their correctness. This guarantee depended for its value upon financial responsibility as well as personal integrity and good reputation of the corporation and its officers, and created a legal liability if any errors occurred in their abstracts. The testimony is to the effect that this added materially to the company's business. It was a protection not fully afforded by any other abstract office in that county.

In view of these facts, it is our opinion that capital was a material income-producing factor in the petitioner's business. This being true, one of the tests required to be met is lacking and the company does not come within the scope of section 200 of the statute. It thus becomes unnecessary to discuss the other features of the case as to whether the petitioner lacks or has met the other requirements of the statute.

*Judgment will be entered for the respondent.*